# In the United States Court of Federal Claims

No. 18-2001C

(Filed Under Seal:  March 19, 2019)

(Reissued:  March 27, 2019)

| | |
|---|---|
| ************************************  )<br>**ESKRIDGE & ASSOCIATES**,  )<br> )<br>Plaintiff,  )<br> )<br>v.  )<br> )<br>**UNITED STATES**,  )<br> )<br>Defendant,  )<br> )<br>and  )<br> )<br>**ANSIBLE GOVERNMENT**  )<br>**SOLUTIONS, LLC**,  )<br> )<br>Defendant-Intervenor.  )<br>************************************ | Post-award bid protest; standing; change in terms of solicitation as a result of corrective action; realism analysis of proposed professional compensation rates; FAR § 52.222-46 |

Joseph A. Whitcomb, Whitcomb, Selinsky, McAuliffe, PC, Denver, CO, for plaintiff. Timothy J. Turner, Whitcomb, Selinsky, McAuliffe, PC, Denver, CO, filed the briefs for plaintiff.

Tanya B. Koenig, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Kelli A. Hooks, U.S. Army Legal Service Agency, Contract and Fiscal Law Division, and John T. Harryman and David L. Bell, U.S. Army Medical Command.

Bryan R. King, Offit Kurman, Tysons Corner, VA, for defendant-intervenor.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide any proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by asterisks within brackets, e.g., "[***]."

LETTOW, Senior Judge.

Plaintiff Eskridge & Associates ("Eskridge") protests the post-award decision of the Department of the Army ("the Army" or "the government") to award a contract for certified registered nurse anesthetist ("CRNA") services to Ansible Government Solutions, LLC ("Ansible"). For relief, Eskridge requests that this court declare the Army's decision to award the contract to Ansible to be arbitrary, capricious, or contrary to law, issue a declaratory judgment that the Army's award was in violation of its own solicitation and of procurement laws, order the Army to award the CRNA contract to Eskridge, and award costs to Eskridge. Compl. at 15-16.

After the administrative record was filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"), Eskridge submitted its motion for judgment on the administrative record on February 11, 2019. *See* Pl.'s Mot. for Judgment on the Admin. R. ("Pl.'s Mot."), ECF No. 19.[2] The United States responded in opposition on February 22, 2019. *See* Def.'s Mot. to Dismiss, Cross-Mot. for Judgment on the Admin. R., & Opp'n to Pl.'s Mot. for Judgment on the Admin. R. ("Def.'s Cross-Mot."), ECF No. 20. Upon completion of briefing, *see* Pl.'s Resp. Opposing Def.'s Mot. to Dismiss & Resp. to Def.'s Cross-Mot. for Judgment on the Admin. R. ("Pl.'s Reply"), ECF No. 21; Def.'s Reply in Support of its Mot. to Dismiss & Cross-Mot. for Judgement on the Admin. R. ("Def.'s Reply"), ECF No. 22, a hearing was held on March 13, 2019 in Washington, D.C.

The court concludes that Eskridge is not an interested party and therefore lacks standing to pursue this bid protest. Accordingly, the government's motion to dismiss the complaint for lack of jurisdiction is GRANTED. The plaintiff's motion and government's cross-motion for judgment on the administrative record are both DENIED as moot.

## FACTS[3]

The solicitation at issue was published on January 4, 2018, AR 7-44, but it has its roots in a solicitation from 2016 that was cancelled in 2017 in connection with corrective action. Compl. ¶¶ 10-19. Eskridge was the low bidder in the prior solicitation, and several of its challenges to the award made to Ansible by the Army on the 2018 solicitation reflect prior proceedings on the 2016 solicitation that resulted in cancellation of that solicitation. In particular, the Army had received bids from offerors under the 2016 solicitation and performed a price realism analysis of the offers, but the 2018 solicitation removed that analytical approach and instead specified a

---

[2]The government filed the administrative record on January 23, 2019, ECF No. 12. It is consecutively paginated, divided into more than 70 tabs and subtabs, and consists of more than 4,500 pages. Citations to the record are cited by tab and page as "AR ___ - ___."

[3]The following recitations constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

realism analysis of professional compensation rates for the CRNAs under 48 C.F.R. (Federal Acquisition Regulations [FAR]) § 52.222-46.[4]

### A. *The Army's Solicitation for Nurse Anesthetist Services*

Based upon the Army's corrective action taken regarding the cancelled 2016 solicitation, the Army released a preview of solicitation number W91YTZ-18-R-0006 ("the solicitation") on October 16, 2017.  AR 3-32 to 34.  This pre-solicitation announcement alerted potential bidders about a contract to supply the services of 14.5 full-time-equivalent certified registered nurse anesthetists to the Womack Army Medical Center, located at Fort Bragg, North Carolina.  AR 3-33 to 34.[5]  The Army planned to award the contract on a Firm-Fixed-Price ("FFP") basis for a base period of six months plus four option years, with performance expected to start on or around April 1, 2018 and end by September 30, 2022.  AR 3-33; *see also, e.g.*, AR 7-46 to 53 (listing the length of the base per option years); AR 10-188.  The Army estimated the cost of the contract, including option years, would total $21,034,111.20.  AR 10-188.  The pre-solicitation preview stated the Army's intent to award the contract as a 100% set-aside for a Service Disabled Veteran Owned Small Business ("SDVOSB").  AR 3-33; AR 10-190 to 91.[6]

The Army subsequently filed the solicitation on January 4, 2018, with bids due on January 24, 2018, by 11:00 AM.  AR 7-44.  The solicitation listed the number of expected hours for the base and option periods, *e.g.*, AR 7-46 to 53,[7] contract performance requirements, *e.g.*,

---

[4]FAR § 52.222-46 is titled "Evaluation of Compensation for Professional Employees" and applies to the evaluation of professional employees' compensation in service contracts.  It requires the government to

> evaluate the [offerors' total compensation plans] to assure that [they] reflect[] a sound management approach and understanding of the contract requirements. This evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work. The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, *its realism*, and its consistency with a total plan for compensation.

FAR § 52.222-46(a) (emphasis added).

[5]CRNAs are "advanced practice registered nurses[] who administer anesthesia and other medications.  They also monitor patients who are receiving and later recovering from anesthesia."  *Nurse Anesthetist*, Nurse.org, https://nurse.org/resources/nurse-anesthetist/ (last accessed March 18, 2019).

[6]Government market research indicated 335 SDVOSBs could "provide the required services."  AR 10-190.

[7]The solicitation also stated a maximum hourly rate for each nurse anesthetist of $208.33 per hour or $400,000.00 per nurse per year.

AR 7-90 (Performance Work Statement), deliverables, *e.g.*, AR 7-108 to 109 (describing the various reports and documentation the Army would require over the life of the contract), and other requirements, *e.g.*, AR 7-56 to 58 (incorporating various FAR provisions).  To evaluate the proposals, the Army planned on using a best value, Lowest Price Technically Acceptable ("LPTA") approach.  AR 7-161 to 62.  Specifically, the solicitation stated that the Army would "initially list proposals from lowest to highest price," AR 7-162, and then evaluate the technical acceptability of the five lowest-priced bids.  AR 7-162.  If any of the lowest five priced proposals were rated technically acceptable, the government would "not evaluate any other proposals" and award the contract to the lowest priced, technically acceptable bidder.  AR 7-162.  In short, price would act as a filter – ideally limiting the more detailed technical evaluation to five bidders.  It also removed the need to conduct a technical comparison among the acceptable bidders, as the lowest-price offeror would prevail.  And due to the LPTA approach, the solicitation also noted that "the government might not evaluate all proposals" for technical acceptability.  AR 7-162 (capitalizations removed).

After sorting the bidders by price, the Army planned to use three factors in determining whether a proposal was technically acceptable: (1) General compliance with solicitation requirements such as registration in the Systems for Award Management ("SAMS") database; (2) Technical merit, consisting of six subfactors;[8] and (3) Past performance.  AR 7-161.  Each of the factors and subfactors were to be evaluated pursuant to the Army's Acquisition Strategy report, which concluded the largest technical risks were recruitment and retention "[d]ue to competitive salaries within the surrounding areas."  AR 10-189 to 90.  On the other hand, price was considered a low risk, as "the [g]overnment will control a major cost driver . . . by assuming the risk of [] malpractice liability" and because "all price proposals will be evaluated for price reasonableness."  AR 10-189 to 90.  The Army set a minimum compensation rate of $113.89 per hour inclusive of fringe benefits.  AR 7-163.  According to an internal memo, the Army made this addition because the prior iteration of this procurement – unlike the current one – incorporated price realism in a best value trade-off analysis.  AR 15-491.  To rectify this compensation "issue," the Army decided to provide "the lowest [per hour wage] amount acceptable" as a "technical factor."  AR 15-491.  In other words, the Army believed the minimum acceptable wage rate acted as a price realism regulator, as any proposal below the minimum per hour target rate would be technically unacceptable.

### B.  *The Amendments to the Solicitation*

The Army amended the solicitation three times over the next month.  First, on January 22, 2018, the Army extended the deadline for bids to January 31, 2018.  AR 9-186 to 87.  Second, the Army issued Amendment 0001 on January 25, 2018, further extending the proposal due date to February 2, 2019, at 2:00 PM and correcting the solicitation to reflect a 100%

---

[8]The six subfactors were: 1. Recruitment plan; 2. Retention plan; 3. Training and immunization plan; 4. Compensation plan; 5. Quality control plan; and 6. Transition plan.  AR 7-161.

SDVOSB set-aside.  AR 11-199.[9]  Notably in Amendment 0001, the Army increased its
minimum compensation to $121.22 per hour within the Compensation Plan technical subfactor.
*E.g.*, AR 11-207.[10]  Amendment 0001 also made additional modifications immaterial to this
protest, *see, e.g.*, AR 11-199 to 205,[11] and answered industry questions, AR 11-340 to 354.
Amendment 0002, filed on January 30, 2018, corrected errors from Amendment 0001.  AR 14-
489; *see also* AR 13-358 (amendment 0002).[12]

### C. *The Army Receives 18 Timely Proposals and Eskridge's First Protest*

The Army received 21 proposals in response to the solicitation.  *See, e.g.*, AR 20-724
(Eskridge's proposal); AR 23-902 (Ansible's proposal).[13]  Two of the proposals were submitted
after the February 2, 2:00 PM deadline and were rejected by the Army for being untimely.  *See*
AR 35-1641 (rejecting the offer of [***] because "the proposal [was] late and cannot be
accepted."); AR 36-1688 (rejecting the "late proposal" of [***]).  One other proposal was
rejected as non-compliant.  *See* AR 16-492; 66-4055 to 56 (finding the proposal of [***] to be
timely, but also "not a complete[] proposal").

Before the Army could begin the evaluation process on the 18 timely, complete
proposals, Eskridge filed a pre-award protest with the Government Accountability Office
("GAO") on February 2, 2018.  AR 37-1742.  This protest had its roots in the previous, cancelled
solicitation from 2016.  AR 37-1743 to 47.  In the cancelled 2016 solicitation, the Army had
found Eskridge's bid technically unacceptable because its proposed wage rates "d[id] not keep

---

[9]The original, January 4, 2018, solicitation had checked the general "small business" set
aside, instead of SDVOSB.  AR 7-44.

[10]This amount consisted of $93.97 in wages and $27.25 in fringe benefits.  AR 11-207;
*see also* AR 15-491.

[11]Among other things, it allowed overtime pay in emergency situations.  AR 11-199 to
206.

[12]Amendment 0002 rescinded the overtime changes of Amendment 0001.  AR 14-489.

[13]The twenty-one offerors were: [***] (Offeror 1), AR 17-501; [***] (Offeror 2), AR 18-
565; [***] (Offeror 3), AR 19-642; Eskrdige (Offeror 4), AR 20-724; [***] (Offeror 5), AR 21-
774; [***] (Offeror 6), AR 22-860; Ansible (Offeror 7), AR 23-902; [***] (Offeror 8), AR 24-
953; [***] (Offeror 9), AR 25-1030; [***] (Offeror 10), AR 26-1081; [***] (Offeror 11), AR 27-
1138; [***] (Offeror 12), AR 28-1187; [***] (Offeror 13), AR 29-1263; [***] (Offeror 14), AR
30-1325; [***] (Offeror 15), AR 31-1408; [***] (Offeror 16), AR 32-1525; [***] (Offeror 17),
AR 33-1586; [***] (Offeror 18), AR 34-1629; [***] (Rejected), AR 35-1641; [***] (Rejected),
AR 36-1688; [***] (Rejected), AR 16-492.

up with pay increases typically seen for healthcare providers," which created a "high risk of retaining providers in the latter years of performance."  AR 37-1743.[14]

According to Eskridge, the Army "acted in bad faith" regarding the 2018 solicitation by failing to include language that had been agreed in the 2017 protest negotiations.  AR 37-1743. Eskridge also contended that the Army's "corrective action[] injects further ambi[g]uity into the terms" by "now relying on the relatively truncated bar of lowest price technically acceptable [] while still incorporating deceptive language allowing for evaluation on 'price realism.'"  AR 37-1743.  Finally, Eskridge also alleged "it would not have withdrawn its [prior] protest," if it had "known the Army would abandon the written agreement."  AR 37-1743, 1745 to 46.  At bottom, Eskridge argued to GAO that the Army failed to comply with the agreement resulting from the 2017 GAO protest by not including unspecified language in the 2018 solicitation.

In response, the Army requested that GAO dismiss the protest on February 12, 2018.  AR 38-2050.  The Army contended that Eskridge failed "to allege facts upon which a legally sufficient assertion of bad faith could be based." AR 38-2056 to 58.  The Army also argued that the 2018 solicitation was not ambiguous and any ambiguity "is actually [Eskridge's] confusion regarding basic government contracting terms."  AR 38-2058 to 60.  According to the Army, the inclusion by reference of FAR § 52.222-46 and the resulting requirement for an analysis of compensation realism of offers "fulfilled the Army's obligation arising from its informal agreement in May of 2017."  AR 38-2059.  Further, the Army contended the minimum wage rate put offerors on notice that any "lower wage rate . . . would be *per se* unrealistic and would cause an Unacceptable evaluation."  AR 38-2059.  Finally, the Army disputed a contention that its prior corrective action was pretext and argued the February 2018 protest was untimely.  AR 38-2060 to 62.

Without explanation, Eskridge withdrew its protest on February 14, 2018.  AR 39-2499.

### D. *The Army's Price and Technical Evaluations*

On February 21, 2018, following Eskridge's withdrawal of its protest, the Army started the evaluation process by sorting the bids according to price.  The five lowest offerors ranged

---

[14]Eskridge had taken exception to this evaluation and filed a protest with the GAO on March 27, 2017, alleging the Army had acted improperly by performing a price realism analysis that was not stated in the 2016 solicitation.  AR 37-1743.  In response, the Army decided to take corrective action and cancel the solicitation.  AR 37-1744; AR 38-2052.  Based on these grounds, the Army moved to dismiss the 2017 protest.  AR 37-1744; AR 2052 to 53.  Eskridge objected to the corrective action, AR 37-1744, but GAO granted the Army's motion and dismissed the protest as academic on May 2, 2017.  AR 37-1744; AR 38-2053.  GAO did, however, permit Eskridge's objection to the corrective action to move forward and encouraged the two parties to negotiate a solution.  AR 37-1744.  After a brief back-and-forth, the two parties agreed on language in a new solicitation that would "clearly state the evaluation criteria, particularly regarding the evaluation of the pricing of compensation."  AR 38-2053; *see also* AR 37-1744.  Eskridge then withdrew its protest on May 22, 2017.  AR 38-2053.

from a low of $16,285,147.20 to a high of $17,126,358.40, *e.g.*, AR 40-2500.  Eskridge was not among the five lowest priced offerors, *e.g.*, AR 66-4057.[15]  The Army then proceeded to evaluate the five lowest priced proposals from a technical perspective.  *See, e.g.*, AR 41-2501 (Offeror 5's unacceptable technical evaluation due to labor rates below the minimum), 2503 to 05 (Ansible's acceptable technical evaluation); *see also* AR 66-4056 (aligning proposal number to offeror).  As the solicitation provided, the Army stopped the technical evaluations after finding three of the five lowest bids to be technically acceptable.  Notifications were sent to the 13 unsuccessful bidders (including Eskridge) on February 28, 2018.  *See, e.g.*, AR 42-2523 (notifying to Eskridge that its "proposal of $18,124,729.20 was not in the five lowest priced proposals" and therefore not evaluated).  Following the notification letters, between March 1 and 5, 2018, five of the unsuccessful offerors requested debriefs.  *See, e.g.*, AR 43-2550 to 2553 (Eskridge's request for debrief and specific questions to the Army).  On March 8, 2018, the Army responded to these questions with mostly generic answers in individual letters.  *See, e.g.*, AR 44-2562 to 2564 ("Your proposal was not in the lowest five prices indicated above; therefore, [it was] not evaluated.").

E.   *The Army's Past Performance Evaluations on the Remaining Bids*

On March 13, 2018, the Army conducted past performance evaluations on the remaining bidders.  *See, e.g.*, AR 45-2567.  Offeror 5 was excluded because its proposal was deemed technically unacceptable.  AR 41-2501 to 02.  Strangely, however, the Army *did* perform a past performance evaluation on Offeror 15, which also rated as technically unacceptable.  *See* AR 41-2513 to 16; AR 45-2567.  And, no past performance evaluation was performed at that time for Offeror 11, rated as technically acceptable.  *See* AR 45-2567 to 95.[16]  The administrative record does not reflect a reason for these discrepancies.

The army evaluated past performance using Contractor Performance Assessment Reports ("CPARs").  CPARs evaluate past performance in up to six areas: Quality, Schedule, Cost Control, Management, Utilization of Small Business, and Regulatory Compliance.  CPARs rate performance as either Unsatisfactory, Marginal, Satisfactory, Very Good, or Exceptional.  Per the solicitation, the Army would evaluate past performance as either acceptable or unacceptable.  AR 7-163 to 64.

Ansible submitted contracts for the past performance evaluation that were for various medical services for the Department of Veteran Affairs, the State Department, and the Womack Army Medical Center.  AR 23-936.  The Army reviewed a CPAR for a further contract for "[b]usiness operations services in support of . . . the US Army Medical Research and Materiel

---

[15]The ranking was: (1) Offeror 15, $16,285,147.20; (2) Offeror 5, $16,522,469.60; (3) Ansible, $16,565,078.40; (4) Offeror 10, $16,817, 587.20; (5) Offeror 11, $17,126,358.40.  AR 40-2500.  Offerors 15 and 5 were rated technically unacceptable.  AR 11-2501, 2513.

[16]This may have been due to Offeror 11's having the highest price ($17,126,358.40) among the lowest priced five bidders or no CPARs may have existed.  Offeror 11 was eventually evaluated after a further corrective action by the Army.  *See* AR 58-3909.

Command," AR 45-2567, in which Ansible received an Exceptional rating in Quality, Schedule, and Management, and did not receive a score in the other three categories.  AR 45-2568. Respecting the Management section, Ansible's rating apparently improved from either Satisfactory or Very Good (initially) to Exceptional (final).  *See* AR 45-2568 to 71.

Offeror 10 submitted information for six past contracts.  AR 26-1125.  Three CPARs existed, two of which were for different periods of performance for the same contract.  That contract required Offeror 10 to provide the full-time services of different types of psychiatric physicians to the Northeast Region Military Treatment Facilities, at a cost of $89,905,666.  AR 45-2573 to 77.  For the two time periods of that contract, Offeror 10 received ratings ranging from Marginal to Satisfactory.[17]  Offeror 10's third CPAR documented services that started in 2015 and are expected to end in 2020, and provided "Emergency Room Physician Services" to an unspecified branch of the military.  The contract was estimated to be worth $9,469,547.  AR 45-2580.  Offeror 10 again received ratings on this CPAR ranging from Satisfactory to Very Good.[18]

Offeror 15 provided information on three prior contracts.  AR 31-1506.  A CPAR existed for one, and the army obtained two other CPARs for different contracts.  One CPAR was for a contract with the Navy to provide various administrative support services, totalling $2,192,021 over one and one-half years.  AR 45-2583.  Offeror 15 received Exceptional ratings in six evaluation categories.  AR 45-2584.  The next contract with a CPAR, also with the Navy, was to provide non-personnel administrative support.  AR 45-2587.  This second contract was worth $2,270,807 for one year of performance.  AR 45-2588.[19]  Offeror 15 received ratings ranging from Satisfactory to Very Good.  AR 45-2588.[19]  Offeror 15's final contract with a CPAR, to provide technology to upgrade and enhance a computer system for the Pacific Air Force, was worth $1,184,334.  AR 45-2593.  For this last contract, Offeror 15 received Exceptional ratings in five evaluation categories.  AR 45-2594.[20]

The record does not reflect whether evaluated offerors received acceptable or unacceptable past performance ratings at this time.

---

[17]For '16-'17 performance, Offeror 10 received Marginal rankings in Quality and Schedule and Satisfactory in Management and Regulatory Compliance.  The other areas were indicated as not relevant.  AR 45-2574.  For '15-'16 performance, Offeror 10 received Satisfactory rankings for Quality, Schedule, Management, and Regulatory Compliance.  AR 45-2578.

[18]Offeror 10 received a Very Good rating in Quality, and a Satisfactory rating in both Schedule and Management.  AR 45-2581.

[19]Offeror 15 received a Very Good rating in Quality and Management, and a Satisfactory rating in Schedule.  AR 45-2588.

[20] Offeror 15 received an Exceptional rating in every category except Cost Control, which did not receive a rating.

On March 23, 2018, the Army decided to award the contract to Ansible, the lowest priced, technically acceptable proposal.  Unsuccessful offerors were notified on the same day. *See, e.g.*, AR 46-2596 (notifying Offeror 5).  Offeror 5, although slightly lower priced than Ansible was rated as technically unacceptable.  AR 46-2596 to 97.  Offeror 10, while technically acceptable, was higher priced than Ansible by approximately $250,000.  AR 46-2598 to 99.  Similarly, Offeror 11 was also technically acceptable but higher priced than Ansible by approximately $550,000.  AR 46-2600 to 01.  Finally, Offeror 15, despite being approximately $300,000 lower priced than Ansible, was rated as technically unacceptable due to their retention plan.  AR 46-2602 to 03.

## F.  *Eskridge's GAO Protest in March 2018*

On March 19, 2018, Eskridge filed another protest with GAO.  AR 47-2604 to 08.  In this protest, Eskridge alleged that the Army's evaluation of offers was "unreasonable, capricious, and contrary to law," AR 47-2605 to 06 (capitalization removed), and that the Army's "evaluation was ambiguous and contrary to the terms of the solicitation," AR 47-2606 to 07 (capitalization removed).  Specifically, Eskridge claimed the "[l]owest [b]ids are not responsive because although they are over the [the] [m]inimum [b]id, they do not include essential amounts," such as administrative costs and profit.  AR 47-2605 to 06.[21]  In addition, Eskridge alleged "that by not evaluating and/or scoring prices the [Army] failed to comply with the direct terms of the solicitation" because the Army was required to "evaluate price for *realism*."  AR 47-2606 (emphasis in original).  This argument conflicted with Eskridge's 2017 GAO protest, where it alleged the Army performed a price realism analysis that was unstated in the 2017 solicitation. *Compare* AR 37-1743, *with* AR 47-2606.  Finally, Eskridge also contended it was "overtly mislead" by the Army's debriefing after rejection of its offer responding to the 2016 solicitation and by the negotiations with the Army that had ensued after its previous protest.  AR 47-2607.

On March 29, 2018, the Army asked GAO to dismiss Eskridge's protest, AR 48-2609, arguing that Eskridge was not an interested party "because there were [multiple] proposals that were evaluated as [t]echnically [a]cceptable with [] lower prices than [Eskridge]'s proposal." AR 48-2613.  According to the Army, "three proposals with lower prices than Eskridge were rated technically acceptable.  There were also four more proposals that were not rated, but had lower prices than [Eskridge]."  AR 48-2615.  As for Eskridge's protest grounds, the Army contended "all three protest grounds fail to state a legally sufficient ground of protest because [Eskridge] failed to provide either allegations or evidence sufficient . . . to establish the likelihood that the GAO would find improper agency action."  AR 48-2614.  Pointedly, the Army averred that "Eskridge appears to be protesting the manner in which its price was evaluated when it knows . . .  it was not evaluated at all because of where its proposed price fell." AR 48-2619.

---

[21]The "minimum bid" was a concept created and calculated by Eskridge for their March 19, 2018 protest.  It appears to be based on a calculation of the minimum hourly rate of $121.22 multiplied by the combined total yearly hours for a total of $15,186,441.60.  AR 2605 to 06. There is no mention of a "minimum bid" in the solicitation.  Ansible's offer exceeded this "minimum bid" by nearly $1.4 million. *See* AR 66-4057.

On April 1, 2018, while proceedings were pending before GAO, the Army awarded and signed a base period contract with Ansible. AR 49-3517. The contract started on April 1, 2018 and ended on September 30, 2018, with a total cost of $1,795,401.60. AR 49-3517.

At GAO, Eskridge filed their response to the Army's request for dismissal on April 6, 2018. AR 50-3629. Its response largely echoed its initial protest. *See* AR 50-3629 to 35. Eskridge argued "[i]f the [Army] reasonably evaluated price based on its own [solicitation requirements], Eskridge's bid would obviously jump the queue and receive appropriate evaluation." AR 50-3633. As for the Army's contention that Eskridge's protest lacked sufficient factual basis, Eskridge admitted it relied on "circumstantial speculation," but did so because "[t]here is simply no way that the lowest bids evaluated for price in the [s]olicitation could be so low and still fall within an acceptable [price]." AR 50-3634.

Following the filing of Eskridge's response, the Army issued a stop work order on April 13, 2018 "[d]ue to [the GAO] protest." AR 51-3636. On the same day, the Army modified the recently signed contract with Ansible to reflect the stop work order. AR 52-3637. But due to the need for CRNAs at the Womack Army Medical Center, the Army also signed a bridge contract with Ansible on April 13, 2018. *See* AR 53-3698. The bridge contract covered the period of April 13, 2018 to July 14, 2018, roughly two months. AR 53-3700 to 01.

On April 18, 2018, whether due to Eskridge's protest or due to protests by another offeror not set out in the administrative record, the Army decided to take corrective action. AR 54-3786. In a memorandum, the Army stated its intent to "revise the source selection documents in order to better document the selection and award process," and to "review the evaluations of the proposals [to determine] if [Ansible] fully compl[ied] with the required special salary stated in the . . . Compensation Plan." AR 54-3786. And, if the Army found Ansible did not comply with the requisite requirements, it would "terminate the current bridge contract . . . and make an award decision to the next in line lowest price and Technically Acceptable offeror." AR 54-3786. In effect, the "[g]overnment's corrective action was to review and evaluate the next lowest priced five (5) proposals." AR 66-4057. Due to this corrective action, the Army requested that GAO dismiss the protest. AR 54-3786. The administrative record does not contain GAO's dismissal of Eskridge's protest due to the corrective action proposed by the Army. It does, however, include the dismissal of a contemporaneous protest by Offeror 3 as untimely. AR 56-3790.

G.  *The Army's Corrective Actions and the Awarding of the Contract*

In April 2018, the Army set about re-evaluating the proposals to conform with the corrective action.[22] The Army spent approximately a month evaluating the *ten* lowest priced offerors on both a technical and past performance basis. *See, e.g.*, AR 58b-3835 (evaluation of

---

[22]The Army signed a new, extended bridge contract with Ansible on July 11, 2018. *See* AR 61-4016. The renewed bridge contract extended the covered period by six months, from July 15, 2018 to January 14, 2019. AR 61-4017 to 18.

Eskridge's past performance (April 24, 2018)); *see also, e.g.*, 59b-3936 to 49 (evaluation of Eskridge's technical proposal, finding it "Technically Acceptable" (April 25, 2018)).[23]

As a result, due to the corrective action in response to the March 2018 GAO protest, the Army had listed the ten bids by price, with an evaluation of each of those lowest bidders from a technical perspective.  AR 66-4059.

| Table Eight (8) Source Selection Board Evaluation Technical Evaluation Consensus – Overall Technical Acceptability List of lowest 10 Proposals | | |
|---|---|---|
| Offeror # | Offeror Name | Overall Technical Acceptability |
| 15 | [ * * * ] | Unacceptable |
| 5 | [ * * * ] | Unacceptable |
| 7 | Ansible Government Solutions, LLC | Acceptable |
| 10 | [ * * * ] | Acceptable |
| 11 | [ * * * ] | Acceptable |
| 2 | [ * * * ] | Unacceptable |
| 6 | [ * * * ] | Unacceptable |
| 8 | [ * * * ] | Acceptable |
| 14 | [ * * * ] | Unacceptable |
| 3 | Eskridge & Associates | Acceptable |

AR 66-4063.

After culling the Technically Unacceptable offerors, the Army had re-sorted the remaining bidders by price and performed a past performance review.

| Table Ten (10) Source Selection Board Evaluation Technical Evaluation Consensus – Overall Technical Acceptability | | | |
|---|---|---|---|
| Offeror # | Offeror Name | Overall Technical Acceptability | Price |
| 7 | Ansible Government Solutions | Acceptable | $16,565,078.40 |
| 10 | [ * * * ] | Acceptable | $16,817,587.20 |
| 11 | [ * * * ] | Acceptable | $17,126,358.40 |
| 8 | [ * * * ] | Acceptable | $17,919,716.00 |
| 3 | Eskridge & Associates | Acceptable | $18,124,729.20 |

---

[23]The Army notified the eight highest-priced, non-evaluated unsuccessful offerors on May 31, 2018.  *See, e.g.*, AR 60-4008 (Letter to Offeror 1 (May 31, 2018)).

| Table Twelve (11) Past Performance Acceptability Five (5) Lowest LPTA Offerors | |
| --- | --- |
| **Company Name** | **Acceptable** |
| Ansible Government Solutions | Acceptable |
| [ * * * ] | Acceptable |
| [ * * * ] | Acceptable |
| [ * * * ] | Acceptable |
| Eskridge & Associates | Acceptable |

AR 66-4073.

For the five technically acceptable offerors, the Army compared each of the stated prices to the Independent Government Estimate ("IGE") to determine if the proposed prices were "fair and reasonable." AR 66-4076.[24] The Army found that the proposed prices were 12% to 33% lower than the IGE and therefore reasonable. AR 66-4076 to 77. For example, Ansible's annual price ranged 14% to 25% below the IGE, while Eskridge's fell between 13% to 14% below the IGE. AR 66-4076 to 77. Thus, after determining Ansible's price was fair and reasonable, while also representing the lowest priced technically acceptable proposal, the Army awarded Ansible the contract for the second time. AR 66-4083 to 84.[25]

On August 6, 2018, the Army notified the remaining nine unsuccessful bidders, including Eskridge, that Ansible was again the awardee. *See, e.g.*, 62-4023. In this notification, the Army provided a chart that compared the unsuccessful offeror's technical evaluation and price with Ansible's. *See, e.g.*, 62-4023. Eskridge's letter shows that its technical rating was comparable to Ansible's, but Eskridge had offered a significantly higher price. Therefore, because Eskridge's "proposal was not the lowest price[d] proposal," it again lost the contract to Ansible. AR 62-4023.

---

[24]The Army in September 2017 estimated hourly compensation would be billed at $150.26 (base year) to $182.62 (fourth option year), of which approximately 75% represented salary and benefits and 25% represented profit and overhead. See AR 2-27 to 31 (IGE). Salary and benefits alone were estimated to cost $118.78 to $144.36 per hour. AR 2-27 to 31.

[25]"The [g]overnment has determined [Ansible is] capable of meeting the requirements with little risk to the [g]overnment." AR 66-4083.

| Evaluation Technical Criteria | Eskridge & Associates | Ansible Government Solutions, LLC |
|---|---|---|
| Overall Technical Rating | Acceptable | Acceptable |
| Recruitment Plan | Acceptable | Acceptable |
| Retention Plan | Acceptable | Acceptable |
| Training Certifications & Immunizations | Acceptable | Acceptable |
| Quality Control Plan | Acceptable | Acceptable |
| Transition | Acceptable | Acceptable |
| Price | $18,124,729.20 | $16,565,078.40 |

AR 62-4023.

Some unsuccessful offerors requested a debrief. For example, Offeror 15 requested a debrief on August 7, 2018, wanting to know why its proposal was rated unacceptable. AR 63-4039 to 40. Eskridge asked for a debrief on August 13, 2018, largely repeating the questions from its March 5 debriefing request. *Compare* AR 63-4041 to 42, *with* AR 43-2550.[26] The Army responded to both on August 22, 2018. The Army's response to Eskridge echoed their previous response and emphasized that Eskridge offered "the fifth highest price" of the technically acceptable offers with acceptable past performance. AR 64-4045 to 48. As for Eskridge's other questions, such as whether their proposal was "visually appealing," the Army replied that it only looked at price and technical acceptability. AR 64-4047.

### H. *Eskridge's Second Post-Award GAO Protest*

Eskridge filed yet a further post-award protest with GAO on August 27, 2019. AR 67-4086 to 96. Like their protest in March 2018, Eskridge claimed the Army's evaluation was "ambiguous and contrary to the" solicitation and was "unreasonable, arbitrary, and contrary to law." AR 67-4090 to 93. Eskridge also alleged, as before, that the Army conducted a disparate evaluation of Eskridge by "winking at its own requirements," and that the Army acted in bad faith by not adhering to the agreed upon terms resulting from their 2017 protest. AR 67-4093 to 95. As before, Eskridge raised a "minimum bid" argument based on the number of hours and the minimum hourly rate detailed by the solicitation. AR 67-4092 to 93. According to Eskridge, Ansible's bid of $16,565,078.40 was too close to the "minimum bid" of $15,186,441.60 to be awardable. AR 67-4093. It also argues that any other bids "in the neighborhood" of Ansible's were "not responsive" because they only "slightly surpass[ed]" the "minimum bid." AR 67-4093. Thus, Eskridge claimed the lower prices of Ansible and the other three bidders made them

---

[26]Eskridge included new questions related to their prior protest, such as "[o]ur price was adjusted after our last protest revealed that the Contracting Officer [] believed [o]ption [y]ear, not [b]ase [y]ear was too low. We therefore adjusted our [o]ption [y]ear [p]ricing upward to match [the Contracting Officer's] guidance. Was our [o]ption [y]ear pricing higher than other bidders?" AR 63-4041.

ineligible for award.  It contends that it provided the lowest priced, technically acceptable offer and should have been awarded the contract.

On September 7, 2018, the Army asked GAO to dismiss Eskridge's protest, AR 68-4097, arguing that Eskridge was not an interested party.  According to the Army, "Eskridge [was] not an interested party because there were four proposals that were evaluated as Technically Acceptable with lower proposed prices than [Eskridge's]."  AR 68-4103.  Because Eskridge only alleged the four lower priced proposals were deficient due to being lower priced, the Army contended that Eskridge's protest was "factually and legally deficient."  AR 68-4105.  The Army also asserted that Eskridge failed to allege a sufficient factual basis or any violation of procurement law, and that counts of the protest were untimely.

Eskridge responded to the Army's request for dismissal on September 12, 2018, AR 69-4699, arguing that they were an interested party, and GAO should not "accept at face value that the five lowest technically acceptable bids are valid and have undergone sufficient evaluation under the terms of the solicitation," AR 69-4702 to 06.  Eskridge also contended that "it is absurd for the Army to argue Eskridge is not an interested party in this matter, [] given its involvement in the history with the previous solicitations and its aid in development of the final product."  AR 69-4705.  Eskridge also stated its protest was timely due to the long running nature of the procurement and argued it had put forward sufficient factual evidence to sustain its claim.  AR 69-4706 to 12.

On November 7, 2018, GAO dismissed Eskridge's protest, finding Eskridge was not an interested party regarding the solicitation.  AR 70-4714, 4716 to 17.  Specifically, GAO found that each of the three firms with a lower price than Eskridge had "a more direct economic interest in this procurement," AR 70-4716, and "Offeror 8's proposed price was a mere $200,000 less than Eskridge's," AR 70-4716.  Thus, GAO found Eskridge's assertions "that other proposed prices that were 'in the neighborhood of' Ansible's also should assessed as nonresponsive" to be "unpersuasive."  AR 70-4716.  Finally, GAO had "no reason to consider Eskridge's complaints that information it received in a prior debriefing, following a previous attempt by the Army to procure [CRNAs], validates its concerns regarding the evaluation of proposals here."  AR 70-4717.

Eskridge filed its complaint with this court on December 28, 2018.

## JURISDICTION & STANDING

The Tucker Act, 28 U.S.C. § 1491, vests this court with jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

### A.  *Whether Eskridge is an Interested Party*

A threshold issue is whether Eskridge, the fifth lowest technically acceptable bidder on a lowest priced technically acceptable solicitation, has standing.  As the plaintiff, Eskridge bears

the burden of establishing standing.  *See, e.g.*, *Myers Investigative & Sec. Servs. Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To demonstrate standing under 28 U.S.C. § 1491(b)(1), a plaintiff must show that it is an "interested party" who suffered prejudice from a significant procurement error.  *E.g.*, *CliniComp Int'l, Inc. v. United States*, 904 F.3d, 1353, 1358 (Fed. Cir. 2018); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Weeks Marine*, 575 F.3d at 1359 (quoting *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *accord CliniComp*, 904 F.3d at 1358; *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)).  Eskridge was an actual bidder.  *See, e.g.*, AR 20-724 (Eskridge's proposal).  The salient question, then, is whether it had a direct economic interest that was affected by the award to Ansible.

The government argues that a direct economic interest requires showing a "substantial chance" of winning the contract.  Def.'s Cross-Mot. at 20.  According to the government, because four other technically acceptable proposals were lower than that of Eskridge and Eskridge's allegations would not undermine those lower bids, the Army presumably would award the contract to someone other than Eskridge.  *See* Def.'s Cross-Mot. at 19-21.

Evaluating prejudice can be important in applying the "substantial chance" standard.  A protestor's substantial chance at an award may only emerge when considering the potential effect of the government's alleged errors.  *See, e.g.*, *Hyperion*, 115 Fed. Cl. at 550 (finding that the fourth highest bidder had standing when the protest alleged that competitors on the face of their bids would not comply with a subcontracting limitation).  Despite the potential relevance of prejudice in determining substantial chance, direct economic interest should still be evaluated separately from prejudice.  *E.g.*, *CliniComp*, 904 F.3d at 1358-59 ("Although the inquires may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest," noting that otherwise even a minor procurement error could be prejudicial so long as the party was an interested party) (citations omitted); *Universal Marine Co. K.S.C. v. United States*, 120 Fed. Cl. 240, 248 (2015) ("[A] proper standing inquiry must not conflate the requirement of 'direct economic interest' with prejudicial error.") (citing *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009)).  A party can have a substantial chance at award and still not be prejudiced where, *e.g.*, the error is minor or affects all parties equally.  *See, e.g.*, *CliniComp*, 904 F.3d at 1358; *Labatt*, 577 F.3d at 1380-81.  But, a party cannot be prejudiced unless it has a substantial chance of award.  *Id*. at 18-21.

In response to the solicitation, the Army received twenty-one offers to provide CRNA services, 18 of which were viable.  After taking corrective action due to the GAO protests of March 2018, the Army performed a technical analysis on the ten lowest priced bidders.  Five were deemed technically acceptable.  Eskridge's offer was among the five but was the highest priced of that group.  In other words, four bidders, each of which was both technically acceptable and lower priced, were in line for the award before Eskridge.  These four offerors thus had a more substantial chance of an award.  To be an interested party and have standing, then,

Eskridge must demonstrate it would have received the contract over the other four bidders if not for errors by the Army.

In its motion, Eskridge argues that "the prices submitted by [the other four] offerors cannot survive a compensation realism evaluation as instituted by the Army's corrective action." Pl.'s Mot. at 12.  In other words, Eskridge contends that if the Army had conducted a compensation realism analysis under FAR § 52.222-46, the other four lower priced bidders would become ineligible, and Eskridge would win the award.  As evidence, Eskridge argues that the prices submitted by the other four bidders are facially incapable of surviving a compensation realism analysis.  Pl.'s Mot. at 18-21

In response, the Army contends that "Eskridge does not point to any failure of the Army to comply with the terms of the solicitation in its evaluation.  Nor does Eskridge challenge any specific technical aspect of the lower-priced proposals."  Def.'s Mot. at 20.  Also, the Army emphasizes that its "intent to remove price realism [from the solicitation published in January 2018] and only evaluate compensation realism was explicitly disclosed in the solicitation."  Def.'s Reply at 4.  The Army also points to the fact that "GAO dismissed Eskridge's protest on the basis that it lacked standing."  Def.'s Cross-Mot. at 21.

Eskridge's contention is flawed for several reasons.  First, the Army set out a minimum hourly compensation rate that acted as a price floor, which all five of the technically acceptable bidders exceeded.  See, e.g., AR 41a-2501 (Offeror 5's evaluation).  By Eskridge's own calculation, the "minimum bid" was $15,186,441.60, AR 2605 to 06, and Ansible's price, $16,565,441.60, was nearly $1.4 million dollars over this "minimum bid."  Second, as noted by GAO, Eskridge's bid was only 9% more than Ansible's and just $200,000 (or 1.3%) more than Offeror 8's the fourth lowest, technically acceptable bid – meaning that Eskridge's own bid would also likely fall to the realism scrutiny if every proposal "in the neighborhood" of Ansible's were so low as to represent a facially unreasonable bid.  And third, the claims of error Eskridge makes in this protest focus primarily on the Army's alleged failure to conduct a compensation-realism analysis, which as a practical matter would affect each of the five lowest-priced and technically acceptable proposals equally.  See, e.g., Universal Marine, 120 Fed. Cl. at 248-49 (finding no standing when the protest of the fourth highest bidder did not challenge the eligibility of two lower-priced offers).  Eskridge cannot sufficiently separate itself from the other technically acceptable bidders based on price alone, especially considering the proximity of Offeror 8's price.

Eskridge also avers that Ansible's bid is "14[%] under the IG[]E for its base year."  Pl.'s Mot. at 20.  But it fails to note that its own proposal is also below the Army's IGE.  According to the Army's analysis, Eskridge's base period bid is 14% below the calculated IGE.  AR 66-4082.  Further, all four lower priced finalists proposed base period rates that were more expensive than Eskridge's, i.e., less than 14% below the IGE.  AR 66-4078 to 81.[27]  While the option years for the other four offerors are priced below Eskridge's price, Eskridge's option years are still 13% to

_____

[27]Offeror 8's base year was 7% below the base period and Offeror 11's base year was 12% below the base year, and Ansible and Offeror 10 were 14% below the base year, but slightly higher than Eskridge.  AR 66-4078 to 82.

14% below the IGE.  AR 66-4082.  Eskridge's claim about the "astounding" rates below the IGE of the other bidders, Pl.'s Mot. at 20, is not persuasive when viewed in context.

In its effort to establish standing, Eskridge tries to distinguish itself from one decision in this court, while also attempting to draw parallels to another.  *See* Pl.'s Mot. at 11-12 (citing *Hyperion*, 115 Fed. Cl. 541, and *Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759 (2018)).  First, Eskridge attempts to draw a comparison between itself and the plaintiff in *Hyperion*.  Pl.'s Mot. at 11-12 ("[L]ike the protestor in *Hyperion*[], Eskridge is challenging the eligibility of the other four bidders involved in [the solicitation].").  In *Hyperion*, the court found the four bidders in line for the contract in front of the protestor did not facially comply with a solicitation requirement, and that two of the four bidders also failed to comply with another technical requirement.  *Hyperion*, 115 Fed. Cl. at 550-56.  Therefore, due to the errors made by the agency in its evaluation of the bids of those offerors, the court held the plaintiff had a substantial chance of receiving the contract despite being fifth in line.  *See id.* at 556.  But as previously discussed, the only procurement error alleged by Eskridge would apply to every bidder including itself, not just those with a lower price, and the other prices are so close to Eskridge's so as to make its protest problematic.  Stating that "Eskridge is challenging the eligibility of the other four bidders involved in [the solicitation]," Pl.'s Mot. at 12, does not equate to the circumstances of the plaintiff in *Hyperion* because there is nothing facially wrong with the four lower bids.

Eskridge also fails to distinguish itself from *Veteran Shredding*.  In *Veteran Shredding*, the court found that because the plaintiff was the highest priced of three technically acceptable proposals, and because the alleged error affected the "technically acceptable proposals equally," the plaintiff did not have a direct economic interest and therefore lacked standing.  *Veteran Shredding*, 140 Fed. Cl. at 765.  This case presents a fact pattern with two more bidders whose technical acceptability has not been credibly challenged standing between Eskridge and a substantial chance at the award.

## B.  *Eskridge's Attempt to Re-Litigate the Result of the Former GAO Protests*

The Army also contends that Eskridge waived other grounds of its protest.  *See* Def.'s Cross-Mot. at 14-19.  The Army avers that much of Eskridge's argument "depends on [the] assertion that no other offeror could reasonably offer a lower price than Eskridge because . . . in the 2016 solicitation evaluation, [the Army] determined that Eskridge's price was unrealistic and had the Army conducted a [similar] price realism analysis in this procurement," it would have found the other offerors' prices unrealistic.  *Id.* at 15.  Thus, according to the Army, "Eskridge seeks to impose on the Army the terms of the cancelled 2016 solicitation," *id.* at 17, but that "[a]ny argument Eskridge wished to make regarding that solicitation is now waived," *id.* at 15.  The Army also argues any claims related to the terms or language of the solicitation have been waived.  *Id.* at 17-19.  Specifically, the "time to litigate and clarify the terms of the solicitation was to do so before the solicitation closed."  *Id.* at 19.  Therefore, the Army argues Eskridge waived its ability to protest to the extent that its current protest is rooted in the 2016 solicitation or in the language of the current solicitation.

The Army is correct that Eskridge places significant weight on the fact it was the lowest bidder in a 2016 solicitation for CRNA services that was cancelled. Eskridge attempts to connect the 2016 solicitation to the present one throughout its motion. *See, e.g.*, Pl.'s Mot. at 23 ("The debriefing provided to Eskridge after the first [s]olicitation [] was wrong."); *id.* at 24 ("Further, nothing in the first solicitation alerted Eskridge that its proposed prices would undergo such a strict evaluation for realism.").[28] But the protest in this case is not about the 2016 solicitation. Rather, it is about the solicitation published by the Army on January 4, 2018 for CRNA services. "[E]ach procurement must stand or fall on its own administrative record." *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 132 (2015); *see also SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001) ("Each procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement."). The Army cancelled the 2016 solicitation after Eskridge's protest, *see* AR 37-1744, and the solicitation issued in January 2018 is distinct from the one in 2016. Therefore, Eskridge's litany of arguments regarding the 2016 solicitation are immaterial to the present case.

Eskridge also disputes the omission of certain language regarding price realism in the solicitation. *See, e.g.*, Pl.'s Mot at 25 ("Explicit mention that the army would utilize compensation realism and price reasonableness in evaluating proposals[] was not included in the second [s]olicitation . . . . Thus, the evaluation process for both solicitations is interchangeable."). This contention appears to arise from the negotiations stemming from the cancelled 2016 solicitation. But as GAO noted, "[p]rotests challenging the terms of a solicitation must be filed before the deadline for submitting proposals." AR 70-4715 to 16 n.3 (citing 4 C.F.R. § 21.2(a)(1)). "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *see also Weeks Marine*, 575 F.3d at 1362-63; *Argencord Mach. & Equip. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005) ("Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award.").

In the present case, the close of the bidding process was February 2, 2018. Eskridge is therefore attempting to shoehorn a pre-bid, pre-award claim into a post-award protest. If the January 4, 2018 solicitation lacked the language Eskridge wanted, it would have been readily obvious from the date of the pre-solicitation notification in October of 2017 and certainly by the solicitation issued in January 2018. Eskridge's February 2018 GAO protest was arguably an appropriate means for Eskridge to raise this issue, but that protest was withdrawn less than two weeks after filing without explanation. Eskridge cannot retrieve that abandoned procedural position. And regardless, the 2018 solicitation incorporated by reference FAR § 52.222-46, which put all offerors on notice that the Army intended to conduct an analysis of compensation realism as part of the technical evaluation. *See Sparksoft Corp. v. United States*, 141 Fed. Cl. 609, 627 (2019) (Where a solicitation incorporates FAR § 52.222-46, "[the procuring agency] has an obligation to undertake a realism analysis of [] professional compensation rates . . . to

---

[28]The first solicitation did incorporate FAR § 52.222-46, which alerted Eskridge to a compensation realism analysis.

ensure they will satisfy the requirements of FAR § 52.222-46 and provide the government 'uninterrupted high-quality work.'").

In sum, because Eskridge offered the fifth highest technically acceptable bid and its protest does not make a credible challenge to the technical acceptability of four lower bids, the court concludes that Eskridge lacked a substantial chance at award. Therefore, Eskridge cannot show a direct economic interest in the protest and consequently is not an interested party and lacks standing.

## CONCLUSION

For the foregoing reasons, the court finds that Eskridge lacks standing to protest the award at issue or the cancellation of the previous solicitation. Accordingly, the government's motion to dismiss is GRANTED. Eskridge's and the government's motions for judgment on the administrative record are therefore both DENIED as moot. The Clerk shall enter judgment accordingly.

No costs.

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Senior Judge